UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                          :

CONCIERGE AUCTIONS, LLC, suing herein as     :
SOTHEBY'S CONCIERGE AUCTIONS,        :

                          :            24-CV-1681 (VEC)
                        Petitioner.   :

                          :            <u>OPINION & ORDER</u>
         -against-             :

A-M 2018 HOMES, LLC,             :

                          :
                  Respondent.   :

------------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

     Petitioner Concierge Auctions, LLC ("Concierge") seeks to confirm an arbitration award

finding that Respondent A-M 2018 Homes, LLC ("A-M") breached the parties' Auction

Agreement.  Pet., Dkt. 1.  A-M cross-moved to vacate the award.  Cross-Mot., Dkt. 8.  For the

following reasons, Concierge's petition to confirm the arbitration award is GRANTED, and A-

M's cross-motion to vacate is DENIED.

## BACKGROUND

### I.    Factual Background[1]

     A-M is a Virginia limited liability company ("LLC") and the owner of residential

property.  Pet. Ex. H ("Patrial Award"), Dkt. 1-8, at 2.  At all relevant times, Ahmad Khreshi was

a principal owner and sole manager of A-M.  *Id.* at 8.  In May 2022, Khreshi met Rick Bradford,

Vice President of Business Development at Sotheby's Concierge Auctions ("Concierge"), who

---

[1]    In adjudicating a petition to confirm an arbitration award, "[a] district court must accept findings of fact [by
the arbitrator] if they are not clearly erroneous."  *Hoai Ngo v. Oppenheimer & Co.*, 444 F. Supp. 3d 628, 633
(S.D.N.Y. 2020).  Here, neither party has challenged any of the arbitrator's factual conclusions as clearly erroneous.
*See, e.g.*, Resp't Mem., Dkt. 10, at 3 (listing "agreed upon background facts").  Therefore, the Court relies on the
arbitrator's findings of fact, as set forth in the Partial Award.  Dkt. 1-8.

expressed interest in auctioning a luxury home owned by A-M. *Id*. at 2. Over the next several weeks, Khreshi communicated extensively with Bradford and others at Concierge about selling the property at auction. *Id*. Throughout these interactions, Khreshi represented that he had unilateral authority to bind A-M to any agreement to sell its property. *Id*.

On August 2, 2022, Bradford sent A-M a standard form Auction Agreement, *see* Pet. Ex. C ("Auction Agreement"), Dkt. 1-3, listing Khreshi as the sole signatory for A-M (per his request). Partial Award at 2. Khreshi signed it two days later. *Id*. The Auction Agreement provides that A-M "represents and warrants to [Concierge] that . . . [it] has full power and authority to execute this Agreement, to sell the Property at Auction, and to consummate the transactions contemplated by this Agreement." *Id*. at 3. The Auction Agreement further provided that A-M would pay Concierge a premium of 12% of the highest bid upon auction of the property or an equivalent payment if the sale failed to close due to the actions of A-M or its agents. *Id.* at 10. The Auction Agreement also contained a mandatory arbitration clause, pursuant to which the parties would "submit any and all controversies, disputes, claims and matters of difference . . . exclusively to Confidential Arbitration in New York, New York." Pet. ¶ 16.

Over the next month, Concierge and Khreshi continued to communicate about the auction, discussing, among other things, marketing efforts and the final contract of sale. Partial Award at 3–4. These communications included a September 8, 2022, "green-light" call in which Khreshi and Ron Mangas, A-M's real estate broker, reviewed the known bids and confirmed their desire to proceed with the auction. *Id*. at 4.

On September 10, 2022, Khreshi asked Concierge whether there would be space for his "partner" at the auction. *Id.* at 4–5. Concierge said yes and asked for the partner's name, to

which Khreshi responded, "Riyad Hijjaj." *Id*. at 5. There is no evidence that Hajjaj's name had ever been mentioned to anyone at Concierge prior to this communication. *Id.* at 11.

On September 15, 2022, Khreshi and Hajjaj attended the live auction in New York City. *Id*. at 5. Throughout the auction,

> Khreshi and Hajjaj engaged in pleasant small talk with representatives of [Concierge]. Neither of them raised any concern or objection about the auction process, nor any actions leading up to the auction, including the many contractual documents executed by Khreshi, on behalf of A-M,[2] before such time. . . . At no point before or during the Auction did Khreshi or Hajjaj suggest that [Concierge] could not, or should not, proceed with the auction due to a 'missing signature', or any other missing authorization to the auction process, or any of the various agreements previously signed by Khreshi.

*Id*. The auction concluded, and the property was sold to the highest bidder. *Id*. The buyer countersigned a purchase and sale contract that Khreshi had signed on behalf of A-M prior to the auction. *Id*.

Five days later, Khreshi notified Concierge that the "final contract" was missing his "partner's signature." *Id*. Concierge responded that the terms of the Auction Agreement, which had been executed by Khreshi in early August, required A-M to do whatever was necessary to effectuate the sale. *Id*. Seven days later, Mangas informed Concierge that A-M had an agreement, *see* Gordon Decl. Ex. 9 ("Operating Agreement"), Dkt. 9-23, that required all members of the LLC to sign all contracts purporting to bind the company and that Hajjaj was a member. Partial Award at 6.

On September 30, 2022, Khreshi informed Concierge that A-M would not proceed with the sale. *Id*. According to Khreshi: "The owner is the LLC and two people need to sign on behalf of our LLC." *Id*. Although Khreshi stated that he had "informed [Concierge]" that Hajjaj

---

[2]     The Partial Award stylizes Respondent's name as "AM." For consistency, references in the Partial Award to "AM" have been changed to "A-M."

was a member of the LLC, *id*., the arbitrator's review of the record, including dozens of emails that had been exchanged between the parties over the course of several months prior to the auction revealed "not a single reference to Hajjaj's name," other than in the email in which Khreshi asked to bring him to the auction, *id*. at 11. The record also showed no evidence prior to the auction of an Operating Agreement that governed A-M. *Id*.

In light of A-M's refusal to sell, the winning buyer negotiated a release from the sale contract and a return of his deposit. *Id*. at 6.

## II.    Procedural Background

On November 1, 2022, Concierge commenced arbitration proceedings against A-M[3] with the American Arbitration Association ("AAA"). *Id*. at 6. Concierge sought an award of $408,000 in satisfaction of the unpaid premium and an award of fees and costs. Pet. ¶ 23.

The arbitration was conducted pursuant to the Commercial Rules of the AAA, with Jonathan T.K. Cohen serving as the arbitrator. *Id*. ¶ 20. The parties filed lengthy briefs, and the arbitrator held a two-day evidentiary hearing. At the hearing, the arbitrator reviewed extensive documentary evidence and heard from three witnesses (Bradford, Mangas, and another Concierge employee). Partial Award at 6–7. Neither Khreshi nor Hajjaj testified at the evidentiary hearing, and "not a single document, email or sworn statement was proffered during the hearing to support Khreshi's allegation that he had discussed with [Concierge] a need for an additional signature on legal documents signed by Khreshi at any relevant time before the Auction process was completed." *Id*. at 7.

---

[3]    Concierge also named Khreshi in its Demand for Arbitration. Khreshi successfully petitioned the Supreme Court of New York to stay the arbitration against him individually because he was acting at all times as a representative of A-M. Partial Award at 7.

On October 20, 2023, the Arbitrator issued the Partial Award, which ordered A-M to pay the $408,000 premium.  Partial Award at 16.  The 17-page Partial Award contains extensive legal and factual analysis and concludes that Khreshi had at least apparent authority (and possibly actual authority) to bind A-M to the Auction Agreement.  *Id.* at 9, 13–14.  On January 3, 2024, the Arbitrator issued a final award, reaffirming the $408,000 award and requiring A-M to pay Concierge's attorneys' fees and costs in the amount of $185,100.61.  Pet. ¶¶ 26, 28.

On March 5, 2024, Concierge moved to confirm the arbitration award.  *See* Pet.  On March 29, 2024, A-M cross-moved to vacate the award on the grounds that the Arbitrator erred in finding that Khreshi had authority to bind A-M in his interactions with Concierge.  *See* Cross-Mot.; Resp't Mem., Dkt. 10, at 15–24.  The arbitral award remains unpaid, and this Court has ordered A-M not to transfer any of its assets prior to the adjudication of these Motions.  *Id.* ¶ 29; May 8, 2024, Order, Dkt. 39.

## DISCUSSION

### I.    Legal Standard

Pursuant to the Federal Arbitration Act ("FAA"), "[i]f the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, . . . the court must grant such an order, unless the award is vacated, modified, or corrected as prescribed in [the statute]."  9 U.S.C. § 9.  "A party moving to vacate an arbitration award has the burden of proof, and the showing required to avoid confirmation is very high."  *STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*, 648 F.3d 68, 74 (2d Cir. 2011) (quoting *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006)).  The FAA allows courts to vacate an arbitration award only if "(1) the award was procured by 'corruption, fraud, or undue means'; (2) the arbitrators exhibited 'evident partiality or corruption'; (3) the arbitrators

were guilty of 'misconduct' such as 'refusing to hear evidence pertinent and material to the controversy' or 'any other misbehavior' that prejudiced the rights of any party; or (4) the arbitrators 'exceeded their powers.'" *Pfeffer v. Wells Fargo Advisors, LLC*, 723 F. App'x 45, 47 (2d Cir. 2018) (quoting 9 U.S.C. § 10(a)).

The Second Circuit also recognizes a "judicially-created ground" for vacatur; "an arbitral decision may be vacated when an arbitrator has exhibited a manifest disregard of law." *Hoai Ngo v. Oppenheimer & Co*., 444 F. Supp. 3d 628, 633 (S.D.N.Y. 2020) (quoting *Jock v. Sterling Jewelers Inc*., 646 F.3d 113, 121 (2d Cir. 2011)). Judicial "review under the doctrine of manifest disregard is severely limited" and courts are "highly deferential to the arbitral award." *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 389 (2d Cir. 2003) (citation omitted). "An arbitral award may be vacated for manifest disregard of the law only if a reviewing court . . . finds both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case." *Wallace v. Buttar*, 378 F. 3d 182, 189 (2d Cir. 2004) (cleaned up). "[A]wards are vacated on grounds of manifest disregard only in those exceedingly rare instances where some egregious impropriety on the part of the arbitrator is apparent." *T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc*., 592 F.3d 329, 339 (2d Cir. 2010) (cleaned up). "[A]n arbitration award must be upheld when the arbitrator offer[s] even a barely colorable justification for the outcome reached." *187 Concourse Assocs. v. Fishman*, 399 F.3d 524, 526 (2d Cir. 2005) (quoting *Wackenhut Corp. v. Amalgamated Local 515*, 126 F.3d 29, 31–32 (2d Cir. 1997)).

## II.    The Arbitrator Did Not Disregard Controlling Law When He Concluded that Khreshi Had Apparent Authority to Bind A-M

A-M's chief objection is to the arbitrator's conclusion that Khreshi acted with apparent authority to bind A-M when he signed the Auction Agreement.[4]  Under New York law,[5] an agent who lacks actual authority "may still be imbued with the authority to bind the principal through the doctrine of apparent authority." *Themis Cap., LLC v. Democratic Republic of Congo*, 881 F. Supp. 2d 508, 522 (S.D.N.Y. 2012).  Apparent authority "arises from the written or spoken words or any other conduct of the principal which, reasonably interpreted, causes [a] third person to believe that the principal consents to have [an] act done on his behalf by the person purporting to act for him." *Minskoff v. Am. Exp. Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996) (citation and internal quotation marks omitted); *Highland Cap. Mgmt. LP v. Schneider*, 607 F.3d 322, 328 (2d Cir. 2010).

In the context of LLCs, New York law provides:

> [E]very manager is an agent of the limited liability company for the purpose of its business, and the act of every manager, including the execution in the name of the limited liability company of any instrument, for apparently carrying on in the usual way the business of the limited liability company, binds the limited liability company, unless (A) the manager acting has in fact no authority to act for the limited liability company in the particular matter and (B) the person with whom he or she is dealing has knowledge of the fact that the manager has no such authority.

N.Y. Limited Liab. Co. § 412(b)(2).  Put otherwise, the actions of a manager of an LLC are "binding on [the LLC] as long as he [has] apparent authority: *i.e.*, [if] he acted 'apparently

---

[4]    Although the parties have also briefed the issue of actual authority, the arbitrator did not render a clear decision on that issue.  *See* Partial Award at 13 ("[T]he overall record demonstrates that Khreshi, on behalf of A-M, acted with at least apparent authority, if not also actual authority . . . .").  Because the arbitrator definitively decided only the issue of apparent authority, the Court's review is limited to that issue.

[5]    The parties agree that New York law governs this dispute.  *See* Resp't Mem. at 2; Mem. in Further Support of Pet., Dkt. 15, at 15.

carrying on in the usual way the business of the limited liability company.'" *JMM Properties,*

*LLC v. Erie Ins. Co*., 548 F. App'x 665, 666 (2d Cir. 2013) (quoting N.Y. Limited Liab. Co.

§ 412(b)(2)); *see also Nat'l Black Theatre Workshop Inc. v. Nubian Properties LLC*, 89 A.D.3d

518, 520 (1st Dep't 2011) (manager bound LLC by carrying on its business as normal and

representing that he had authority).

      The Partial Award accurately describes the law of apparent authority as it pertains to

LLCs. *See* Partial Award at 12 (quoting *Pasquarella v. 1525 William St., LLC*, 120 A.D.3d 982,

983 (4th Dep't 2014)) ("[W]here management of an LLC is vested in a manager, the acts of the

manager are binding upon the LLC unless the manager at issue has in fact no authority to act for

the LLC, and the person with whom he or she is dealing knows that the manager lacks such

authority.").  Finding that "Khreshi was indisputably and solely vested with day-to-day

management authority over all business and affairs of A-M," the Partial Award lists the myriad

ways in which Khreshi carried out A-M's business over the course of his relationship with

Concierge.  *Id*.  Specifically, it notes the "credible testimony and documentary evidence"

showing that Khreshi engaged Concierge to perform marketing services "in collaboration with

A-M" and "without any complaint or objection from A-M."  *Id.* at 10.  Among other things, the

arbitrator found that "Khreshi provid[ed] detailed, sophisticated feedback to draft Auction

Agreement documents, prior to Khreshi executing such documents, which confirmed his careful

review and understanding of the contractual terms."  *Id.* at 8.  In light of the overwhelming

evidence that Khreshi carried out A-M's business in the typical manner of a manager vested with

the authority to execute a real estate transaction, the arbitrator concluded that the "overall course

of conduct by and between [Concierge], Khreshi, Mang[a]s, . . . and even [Concierge's] brief

interactions with Hajjaj, on the day of the live auction, further reinforced the impression that Khreshi was acting with at least apparent authority at all relevant times." *Id.* at 11.

Under New York law, if the manager of an LLC appeared to be engaged in the ordinary business of the LLC, two facts must be established in order to rebut the presumption that the manager had apparent authority to act on behalf of the company. N.Y. Limited Liab. Co. § 412(b)(2). First, it must be shown that the manager, in fact, had "no authority to act for the limited liability company in the particular matter"; and second, it must be shown that the party with whom the manager was dealing knew the manager had no such authority. *Id.*

The arbitrator expressed doubt that the Operating Agreement actually deprived Khreshi of authority to enter into the Auction Agreement,[6] but found that, even if it did, there was no evidence that Concierge knew that Khreshi lacked authority to bind A-M. At the evidentiary hearing, Concierge presented a wide range of evidence, including testimony from three witnesses "who each asserted that Khreshi had repeatedly represented that he had authority to sign the Auction Agreement documents, and other contractual documents for A-M, by himself, and that no contrary statements or written allegations were ever made by Khreshi or anyone else to assert a contrary position before the live auction process was completed." *Id.* at 10. Neither Khreshi nor Hajjaj testified at the hearing, and "not a single document, email or sworn statement was proffered during the hearing" to support Khreshi's assertion that he told Concierge before the

---

[6]     The Partial Award notes, "A-M's attorney . . . represented in discovery related correspondence that he was not able to locate or disclose a copy of a single written document by or from or between Hajjaj and Khreshi, nor any other document to or from Hajjaj that was discovered or disclosed, beyond alleged copies of the Operating Agreement disclosed after the auction process was completed." Partial Award at 11. But even if the Operating Agreement was actually in effect at the time Khreshi executed the Auction Agreement, Section 7 of the Operating Agreement "provides that Khreshi, as A-M's sole manager, held authority over all 'business and affairs of the Company', which include: 'marketing real property for sale or retention of brokers or consultants in aid of same.'" *Id.* at 12.

auction that the other member of the LLC needed to sign all of the agreements that he had signed solo. *Id.* at 7.

Khreshi's authority was further confirmed by the actions of Mangas, A-M's real estate broker. Mangas joined Khreshi on the "green light call" and he deferred to Khreshi to make the final decision whether to proceed with the auction. *Id.* at 12. Additionally, Mangas "relied on Khreshi alone to sign a listing agreement with his local Virginia real estate agency, without any second signature of any other owner or member of A-M." *Id.*

In short, it is clear from the face of the Partial Award that the arbitrator did not "kn[o]w of a governing legal principle yet refuse[ ] to apply it or ignore[ ] it altogether." *Wallace*, 378 F. 3d at 189. To the contrary, the Partial Award accurately stated the governing law for assessing whether a manager of an LLC acted with apparent authority and reasonably applied that law to the evidence adduced during the arbitration. Nothing more is needed for the Court to affirm the award.

Nevertheless, A-M argues that the arbitrator manifestly disregarded governing law — a conclusion it reaches by inventing its own legal standard. Despite acknowledging that N.Y. Limited Liab. Co. § 412 is "a codification of the apparent authority doctrine in the context of LLCs," A-M largely ignores it. Resp't Mem. at 22 n.11. Instead, it relies on the general principle that an "agent cannot by his own acts imbue himself with apparent authority" to argue that "A-M did nothing to imbue Khreshi with authority." Resp't Mem. at 19, 23 (citing *Hallock v. State*, 64 N.Y.2d 224, 231 (1984)). More specifically, A-M asserts that because Concierge "never received anything from [Hajjaj] regarding Khreshi's LLC authority," A-M did nothing to indicate that Khreshi had the power to bind the company. *Id.* at 23.

It is, of course, true that apparent authority is measured by the actions of principals rather than agents — and the Partial Award acknowledges as much. *See Highland Cap. Mgmt. LP v. Schneider*, 607 F.3d 322, 328 (2d Cir. 2010) ("Where an agent lacks actual authority, he may nonetheless bind his principal to a contract if the principal has created the appearance of authority, leading the other contracting party to reasonably believe that actual authority exists."); Partial Award at 9 ("Apparent authority is analyzed in two steps: First, courts determine whether the principal's actions created the appearance of authority and, second, courts examine whether the plaintiff reasonably relied on this appearance."). But it is also true that "[c]orporations are not natural persons [and out of] necessity, [they] must act solely through the instrumentality of their officers or other duly authorized agents." *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 465 (2010). As a result, "the acts of agents, and the knowledge they acquire while acting within the scope of their authority are presumptively imputed to their principals." *Id*. This means that a party "may assume that a member of a member-managed LLC has the authority to bind the LLC." *Merrell-Benco Agency, LLC v. HSBC Bank USA*, 20 A.D.3d 605, 607 (3d Dep't 2005) (citing N.Y. Limited Liab. Co. §§ 402, 412)).

Even if A-M were correct that the law requires all members of an LLC to appear to sanction the putative agent's conduct in order for apparent authority to exist (a legal principle that is not accurate), that standard would easily be satisfied here. Hajjaj, the only other member of the LLC, attended the auction with Khreshi, and "[n]either of them raised any concern or objection about the auction process." Partial Award at 5. It is difficult to imagine a clearer sign that Hajjaj condoned Khreshi's decision to enter into the Auction Agreement than the fact that he attended the auction with Khreshi, interacted directly with Concierge, and watched the property be sold — all without uttering a disapproving word. *See 1230 Park Assocs., LLC v. N. Source,*

*LLC*, 48 A.D.3d 355, 356 (1st Dep't 2008) (examining, for purposes of ascertaining apparent authority, whether any "acts or statements" by other members of an LLC "conferred such authority" to a member that acted unilaterally); *see also* Partial Award at 12 ("By Hajjaj attending the auction, and not objecting, as he watched A-M's Property be auctioned off, he provided additional evidence to [Concierge] that Khreshi had always acted with his consent and authorization, to the extent such authorization was truly required . . . ").

A-M also argues that Concierge's claim that Khreshi had apparent authority is undercut by Concierge's alleged duty to uncover A-M's Operating Agreement, which identified Hajjaj as the other member of the LLC and which indicated that his approval was needed to ratify any transaction. Resp't Mem. at 7–10, 21–22. Even assuming the Operating Agreement was valid, Concierge had no duty to find it. When an LLC manager "appear[s] to be carrying on the normal business of the [c]ompany," the party with whom it is dealing is "not required to review the [LLC's] operating agreement before . . . reasonably rely[ing] on [the manager's] authority." *Nat'l Black Theatre Workshop Inc.*, 89 A.D. at 520. The evidence fully supports the arbitrator's conclusion that Concierge was justified in believing that Khreshi had authority to bind A-M. That being the case, it had no obligation to insist on production of an Operating Agreement that it had no reason to know existed.[7] *See* Partial Award at 11 (evidentiary record contained "not a single reference to . . . a known Operating Agreement that governed A-M" prior to the auction).

In sum, there is ample evidence that Khreshi, in his capacity as sole manager of A-M, carried on business as usual throughout his interactions with Concierge, during which he

---

[7]    For what it is worth, Concierge did, in fact, seek the Operating Agreement. Weeks before the auction, Concierge's lawyer sent Khreshi and Mangas a due diligence checklist that requested, among other things, production of operating agreements. Gordon Decl., Exs. 14–15, Dkts. 9-28, 9-29. Neither Mangas nor Khreshi ever responded to the request. *Id.*; Mem. in Further Support of Pet. at 22 n.14. A-M tries to convert Concierge's failure to pursue its own due diligence checklist into the equivalent of a "get out of jail free" card for itself. It does so with neither law nor logic on its side.

represented that he had authority to bind the LLC.  The arbitrator's thorough analysis of these facts as applied to the governing law furnishes far more than a "barely colorable justification" for the conclusion that Khreshi had apparent authority to bind A-M to the Auction Agreement.  *187 Concourse Assocs.*, 399 F.3d at 526.  Accordingly, the award must be confirmed.

**CONCLUSION**

For the foregoing reasons, Concierge's petition to confirm the arbitration award is GRANTED, and A-M's cross-motion to vacate is DENIED.  The Clerk of the Court is respectfully directed to close the open motion at Dkt. 8 and to terminate the case.


**SO ORDERED.**

Date:  **October 30, 2024**
      **New York, NY**

                                  **VALERIE CAPRONI**
                                  **United States District Judge**